IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LISA M. WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 5234 |
| | ) | |
| v. | ) | Magistrate Judge Geraldine Soat Brown |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| JUVENILE JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lisa M. Wilson ("Wilson") brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-5(f), against defendant Illinois Department of Juvenile Justice ("IDJJ"), alleging one count of sexual discrimination based on harassment and one count of retaliation for reporting the harassment. (Compl.) [Dkt 1.] IDJJ has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. With respect to the sexual harassment count, IDJJ argues that one of the alleged instances of which Wilson complains is time-barred, that IDJJ did not have notice of a second, and that in all remaining alleged instances, IDJJ took prompt, preventive measures. With respect to the retaliation count, IDJJ asserts that Wilson cannot prove all of the elements necessary for a *prima facie* case. Wilson did not file a response to IDJJ"s summary judgment motion or the supporting materials. The parties have consented to the exercise of jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). [Dkt. 18]. For the following reasons, IDJJ's motion is granted.

# FACTUAL BACKGROUND

The following facts are taken from IDJJ's statements of fact filed pursuant to Local Rule 56.1 [dkt 56] (cited as "Def. LR Stmt. _"), as well as from the exhibits submitted with those statements [dkt 58-63] (cited as "Def. LR Ex. _"). Because Wilson did not respond to the motion or IDJJ's statements of fact, those facts are deemed admitted pursuant to Local Rule 56.1(b)(3)(C). *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."). The descriptions of Wilson's claims are based on her complaint [dkt 1] and on Wilson's deposition testimony. (Def. LR Ex. 2, Dep. Lisa Wilson.)

## I. Employment

In February 2000, Wilson began her employment with IDJJ at a juvenile detention facility known as IYC-Warrenville ("IYC"). (Def. LR Stmt. ¶ 3.) Her title was Youth Supervisor II, and the job required supervising female juvenile offenders. (*Id.* ¶¶ 3, 5.) Wilson is still employed at the facility with the same responsibilities but a different job title. (*Id.* ¶ 3.)

## II. Allegations of Sexual Harassment

In her deposition, Wilson testified that the first incident of sexual harassment occurred in 2002, when Freddie Clark ("Clark"), a Youth Supervisor IV at IYC, called her into his office, cupped her breasts and stated, "I want to see if these are real." (*Id*. ¶¶ 6, 7.) Wilson did not say or do anything in response, and she did not report the incident to anyone until several years later, in October 2005, when she was interviewed by an IDJJ Affirmative Action Officer who was

investigating Wilson's sexual harassment complaint. (*Id*. ¶ 8.)

The next alleged incident of harassment occurred between May and June of 2005, when Clark left a handwritten note on the windshield of Wilson's car. (*Id*. ¶ 9.) Wilson did not consider the content of the note to be harassing, but she considers the act itself to be harassment. (*Id*. ¶ 10.) The next incidents alleged by Wilson occurred between April and July of 2005, when Clark called her home telephone and left two voicemails. (*Id*. ¶¶ 12, 19.) Wilson recalls very little of the content of the first voicemail other than that Clark reported being "outside or something like that." (*Id*. ¶ 13.) She has no recollection of what Clark said in the second voicemail. (*Id*. ¶ 17.)

Wilson also testified that on one occasion Clark made an unsolicited visit to her home. (*Id*. ¶ 19.) On a day between May and July of 2005, Wilson looked outside her second-floor bedroom window and saw Clark standing outside the locked security gate of her residence for three minutes. (*Id*. ¶ 20.) She did not call the police. (*Id*. ¶¶ 19-20.) The next day Clark allegedly told Wilson, "By the way, that code doesn't work." (*Id*.¶ 21.)

According to Wilson, Clark also made two remarks that she considered to be sexual in nature. Between January and July of 2005, Clark inquired of her, "When are you going to let me do that?" (*Id*. ¶ 24.) Wilson admits she has no factual basis for concluding that the remark was sexual, only that she "just knew" it. (*Id*. ¶ 25.) During that same period, after learning that Wilson had just purchased new mattresses, Clark commented, "I want to help test out those mattresses." (*Id*. ¶ 27; Wilson Dep. at 83-84.)

Finally, Wilson alleges that Clark inappropriately touched her on two other occasions. The first incident occurred on July 1, 2005 when Clark touched her backside. (Def. LR Stmt. ¶ 28.) Approximately four weeks later, on July 28, 2005, Clark made physical contact with Wilson by

touching her inner thigh after she told him that he made her "uncomfortable." (*Id*. ¶ 30.) That was the final incident of sexual harassment Wilson experienced. (*Id*. ¶ 33.)

### III.     Complaint of Harassment and IDJJ Investigation

Sometime between May and August of 2005, Wilson reported Clark's first voicemail message to Dr. Wendy Navarro ("Dr. Navarro") who was then acting chief of security, and requested that her post be changed to one further away from Clark. (*Id*. ¶ 15; Wilson Dep. at 50.) In response, IYS moved Wilson's post as she requested a couple of days later. (Def. LR Stmt. ¶ 16.) After that complaint, Clark's behavior changed. According to Wilson, there was "no more the little sexual stuff. Just very rude and talking condescending." (Wilson Dep. at 108.) Any conduct that Wilson considered to be sexually harassing stopped. (*Id*.)

On August 21, 2005, Wilson made an oral complaint of harassment to the IYC Clinical Services Supervisor Sue Campagna ("Campagna"). (Def. LR Stmt. ¶¶ 11, 18, 23, 26.) She complained not because of the sexual harassment, which had stopped, but because Clark's behavior had become "rude" and "abrupt." (Wilson Dep. at 108.) Wilson testified that she orally complained to Campagna of the handwritten note left on Wilson's car, the second voicemail message Clark left at her home between May and July 2005, the remark Clark made between January and July 2005, and the July 28, 2005 touching. (Def. LR Stmt. ¶¶ ll, 18, 26, 32, 34). Wilson did not report either the 2002 or the July 1, 2005 incidents of physical touching or the "mattress" comment at the time she orally complained to Campagna. (*Id*. ¶¶ 8, 27, 29.) Campagna asked Wilson to submit her complaint in writing and reported Wilson's oral complaint to IYC Superintendent Jeffrey Bargar ("Bargar"). (*Id*. ¶¶ 35, 39.)

4

Following her discussion with Campagna, on August 21, 2005, Wilson took a leave of absence from her duties at IYC. (*Id.* ¶ 38.)[1] She did not return from leave until November 9, 2005. (*Id.*)

During Wilson's leave of absence, IDJJ began to investigate Wilson's allegations of harassment. On August 23, 2005, Bargar advised Wilson that he had notified the IYC Deputy Director as well as the IDJJ Office of Affirmative Action Administrator Janet Richmond ("Richmond") about Wilson's oral complaint. (*Id.* ¶ 35.) Bargar also prepared an incident report about Wilson's allegations. (Def. LR Ex. 7, Aug. 23, 2005 Incident Report.) During their discussion, Bargar gave Wilson contact information for Richmond, and also sent it to her by letter. (Def. LR Stmt. ¶¶ 36, 37.) Bargar encouraged Wilson to speak directly with Richmond. (*Id.* ¶ 36.) On September 6, 2005, Wilson submitted a written statement alleging physical and verbal sexual harassment. (*Id.* ¶ 39; Def. LR Ex. 9, Sept. 6, 2005 Incident Report.) On October 4, 2005, Richmond began a formal investigation of Wilson's allegations, ultimately submitting her investigation results in a memorandum to Bargar on November 10, 2005. (Def. LR Stmt. ¶ 40; Def. LR Ex. 5, Investigation Results Memo.) Richmond advised Wilson by letter dated October 20, 2005 that Clark had been instructed to have no direct contact with Wilson at work and to communicate with her, if necessary, through a third party. (Def. LR Stmt. ¶ 42.) Likewise, Wilson was also directed to communicate with Clark through a third party. (*Id.* ¶ 43.)

---

[1] In her charge of discrimination to the Equal Opportunity Employment Commission ("EEOC"), filed on January 9, 2006, Wilson explained that her leave was a "medical leave of absence due to stress related to the sexual harassment." (Def.'s LR Ex. 11.)

Richmond interviewed seven witnesses in addition to Wilson and Clark, but "the witnesses did not corroborate Plaintiffs' version of events." (*Id*. ¶¶ 40-41.)[2] Richmond's memorandum reports that no witnesses observed inappropriate behavior by Clark, although some heard Wilson complain of inappropriate behavior, and some heard messages that Clark had left on Wilson's voicemail that were not sexual in content. (Investigation Results Memo at 4-6.) Richmond concluded that Wilson's complaint of sexual harassment was unsubstantiated. (*Id*. at 6.) However, she recommended that Clark be reminded of the expectation of professional behavior. (*Id*.) Richmond notified Wilson of her findings by letter on November 17, 2005, adding that "the individual that is the subject of your complaint has been counseled to be strictly professional and has been reminded of the policy prohibiting retaliation. Also, as you know, steps have been taken to minimize your contact with the reported individual." (Def. LR Stmt. ¶¶ 45-46; Def. LR Ex. 10.)

Wilson and Clark have not had the same shift since 2006. (Def. LR Stmt. ¶ 68.) With one exception, Clark has abided by the arrangement in which Clark and Wilson are to interact via a third party intermediary. (*Id*. ¶ 69.) The one exception was an instance in 2006 when Clark checked on Wilson in the course of his rounds and did not bring another Youth Supervisor with him. That made Wilson "upset," but she did not report it to anyone. (*Id*. ¶¶ 69-71.)

IV.     **Allegations of Retaliation**

Wilson filed a charge against IDJJ with the EEOC and the Illinois Department of Human Rights ("IDHR") on January 9, 2006. (Compl. Ex. A.) Wilson asserts that IDJJ retaliated against

---

[2] By failing to respond to IDJJ's 56.1 statements of fact, Wilson has admitted that statement.

6

her for her internal complaint in 2005, and again for her 2006 EEOC filing. According to Wilson, her August 2005 complaint of sexual harassment to Campagna generated a series of retaliatory efforts that began three months later. (Def. LR Stmt. ¶ 54.) The first occurred on November 9, 2005, when Wilson was assigned to supervise a new post, the Maya A/B Cottage, through December 21, 2005. Wilson alleges the Maya A/B assignment was more "stressful" than her previous one, though she admits that she had been assigned to that cottage numerous times before her August 2005 complaint. (*Id*. ¶¶ 55-56.) Moreover, Bargar was the individual responsible for making the assignment, not Clark. (*Id*. ¶ 54.)

Wilson alleges that a second retaliatory incident took place two days later. On November 11, 2005, Clark documented Wilson's late arrival to work. (*Id*. ¶ 49.) Although she describes this as retaliation, Wilson admits that she was tardy and that no disciplinary action was taken against her. (*Id*. ¶¶ 49-50.)

Wilson testified to a third allegedly retaliatory incident. On an evening between November 9, 2005 and December 21, 2005, Clark failed to assist her in defusing a fight between two youths that occurred on her watch. (*Id*. ¶ 51.) Wilson, however, concedes that security staff managed to break up the altercation, as allowed by IDJJ protocol, and that she was neither harmed nor disciplined for the incident. (*Id*. ¶¶ 51-53.)

Wilson contends more retaliation followed after she filed a charge with the EEOC on January 9, 2006. (*Id*. ¶ 48.) The first was the denial of a hardship transfer on January 24, 2006. (*Id*. ¶ 59.) The committee that denied Wilson's transfer consisted of high-level officials of the Illinois Department of Corrections ("IDOC"), including the Chief of Staff of the IDOC, the Special Assistant to the Director of IDOC, and the Chief Personnel Officer of IDOC. (*Id.* ¶ 60.) Wilson has not

brought forth any facts to suggest that these persons were aware of her EEOC complaint or her earlier 2005 complaint within IDJJ.

Another alleged retaliatory action was a three-day suspension that Wilson received in October 2006 for failing to secure a youth during a routine fire drill in late July 2006. (*Id*. ¶¶ 61-62.) On the day of the incident, when it became known that Wilson had not followed proper protocol, Clark radioed her to secure the youth on her watch. (*Id*. ¶ 63.) Instead, Wilson responded by relinquishing her radio and keys to another Youth Supervisor, verbally resigning her employment, and departing the facility grounds in the middle of her shift. (*Id*. ¶ 64.) Wilson was given a hearing in September 2006 on that action, at which she was represented by a union and had several opportunities to appeal the findings of insubordination, but ultimately a three-day suspension was issued. (*Id*. ¶ 65.) Wilson alleges the suspension was a retaliation for her EEOC complaint and not based any on improper actions she committed. (*Id.* ¶ 61.) Clark played no part in either the hearing or the decision to discipline Wilson. (*Id*. ¶ 66.)

Finally, Wilson alleges that she faced the possibility of an additional suspension for attendance issues, although the suspension never occurred. (*Id*. ¶ 72.)

## LEGAL STANDARD

The court may properly grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining

whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id.* at 255. The court may not make credibility determinations, "choose between competing inferences" or weigh the evidence. *Abdullah v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the non-moving party must designate specific facts showing that there is a genuine issue for trial. *Id.* at 324. The non-moving party may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits, (*id.*), but must present evidence of "evidentiary quality" demonstrating the existence of a genuine issue of material fact. *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994).

## DISCUSSION

### I. Sexual Harassment Claims

A plaintiff bringing a Title VII claim must timely file a charge of employment discrimination with the EEOC; in Illinois that means within 300 days from the date of the unlawful practice, assuming that the complaint was also filed with the IDHR. *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 684 n. 5 (7th Cir. 2010). Wilson filed her claim with the EEOC and the IDHR on January 9, 2006. (Def.'s Answer ¶ 6.) [Dkt 12.] All of the acts of which she now complains occurred after March 15, 2005 (within 300 days before filing), except the incident in February 2002 when Clark

9

allegedly cupped Wilson's breasts.[3] IDJJ argues that Wilson's complaint about that incident is time-barred.

In *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101,122 (2002), the Supreme Court held:

> [A] Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period – 180 or 300 days– set forth in 42 U.S.C. § 2000(e)-5(e)(1). A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period. Neither holding, however, precludes a court from applying equitable doctrines that may toll or limit the time period.

Thus, the court is "to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and, if so, whether any act falls within the statutory time period." *Morgan,* 536 U.S. at 120. IDJJ denies that the 2002 incident is properly characterized as "part of the same actionable hostile work practice" about which Wilson complained three years later. Although Clark is the alleged harasser in all incidents, Wilson never complained about the 2002 incident at or near the time it occurred, and there were no other incidents until 2005. That gap of three years raises a question about whether it is part of the same practice. However, the Seventh Circuit has interpreted *Morgan* as requiring the court to ask whether any of the alleged acts of sexual harassment occurred within the statutory time period and, if so, the court should analyze whether all of the conduct, taken as a whole, created a hostile work environment. *Turner*, 595 F.3d at 685. Accordingly, the 2002 incident will be considered with the rest of the alleged conduct in conducting that analysis.

---

[3] Clark denied that he touched Wilson at all when interviewed by Richmond pursuant to Wilson's complaint. (Investigation Results Memo at 3-4.) But this opinion assumes that Wilson's testimony is true for purposes of the present motion.

For sexual harassment to be actionable under a Title VII claim, it must be "sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment and create an abusive working atmosphere." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986) (quotations omitted). That atmosphere must be both objectively and subjectively offensive, "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). However, the line between sexually harassing behavior and actions that are only "mildly offensive" can be elusive. *Bakersville v. Culligan Intl. Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995). On one side are sexual assaults, physical contact without consent, uninvited sexual solicitations, and intimidating words or acts – all of which will likely constitute sexual harassment. *Id*. at 430. On the other side is the "mildly offensive," which can be described as "occasional[ly] vulgar banter, tinged with sexual innuendo . . . ." *Id.*

Here, a range of conduct is alleged. Clark's touching of Wilson's breasts, backside and inner thigh were incidents of non-consensual physical contact. Other alleged actions were not so clearly sexual in nature. Clark's handwritten note on Wilson's windshield and the two voicemails he recorded on her answering machine cannot be characterized as sexually offensive. By Wilson's own testimony, neither the messages nor the note contained any sexual content. The same is true for Clark's visit to the outer gate of Wilson's home and his comment the next day, "By the way, that code doesn't work." An unexpected arrival by a co-worker to one's home and a comment about it the next day may be disconcerting and beyond the limits of propriety, but it is not necessarily sexually motivated.

Clark's question, "When are you going to let me do that?," and his remark that he wanted to help test out Wilson's new mattresses may be sexually suggestive. "[T]he sporadic use of abusive

11

language, gender-related jokes, and occasional teasing are fairly commonplace in some employment settings and 'do not amount to actionable harassment.'" *Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999) (quoting *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1159 (8th Cir. 1999). However, taken together with the alleged touching, a reasonable person could find these statements to be more offensive than they would be standing on their own.

After a review of all of the alleged behavior, the non-consensual touching is sufficient to raise a question of fact about the objective prong of the test, that is, whether a reasonable person would believe it there was a hostile environment. *See Turner*, 595 F.3d at 685-86. But, by not responding to the present motion, Wilson has not presented any facts or argument to support the subjective prong of the test. The fact that Wilson, by her own admission, did not do or say anything about the 2002 incident, and continued to work with Clark for three more years, suggests that she did not find the atmosphere subjectively so severe or pervasive as to have altered the work environment. *Id.* at 685. In fact, Wilson testified that her decision to lodge the complaint with Campana in August 2005 was not the result of Clark's inappropriate touching, but rather because he became rude and abrupt to her after she succeeded in having her post changed. (Wilson Dep. at 53, 107-08.)

Even assuming, *arguendo*, that there is a sufficient factual question about the existence of a hostile work environment, IDJJ has demonstrated that it is entitled to summary judgment on the harassment claim. "The general rule, crudely stated . . ., is that if the harasser is a supervisor, the employer is strictly liable for the harassment, while if he is a coworker the employer is liable only if it failed to have and enforce a reasonable policy for preventing harassment, or in short only if it was negligent in failing to protect the plaintiff from predatory coworkers." *Doe v. Oberweis Dairy*, 456 F.3d 704, 716 (7th Cir. 2006) (citations omitted). Here, the record on the motion shows that

Clark was not Wilson's "supervisor" so as to impose strict liability on IDJJ for his actions. "A supervisor is someone with the power to directly affect the terms and conditions of the plaintiff's employment. 'Supervisor' is a legal term of art for Title VII purposes, and an employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context." *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004) (citations omitted). Although Clark's job title was higher than Wilson, he had no power to hire, fire, demote, promote, transfer, or discipline her. (Def. LR Stmt. ¶ 7.) For Title VII purposes, Clark was Wilson's co-worker, not her supervisor.

For IDJJ to be liable, Wilson bears the burden of demonstrating that IDJJ knew of the problem and did not act reasonably to protect her from the predatory employee. *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 373 (7th Cir. 2007). A reasonable response by the employer depends on its timeliness and whether it is reasonably likely to prevent the misconduct from recurring. *Saxton v. AT&T*, 10 F.3d 526, 535 (7th Cir. 1993). The reasonableness of the response will also be measured by the gravity of the harassment. *Baskerville*, 50 F.3d at 432.

When Wilson complained, IDJJ responded in a timely and reasonable manner and, as far as this record shows, that has resolved the problem. When Wilson first reported a problem to Dr. Navarro sometime between May and August of 2005, Wilson's request that her post be moved further away from Clark's was granted within days. When Wilson lodged a more formal complaint to Campagna, the IYC Clinical Services Supervisor, on August 21, 2005, Bargar promptly contacted the IDJJ Deputy Director, as well as Richmond, the Affirmative Action Officer, who conducted an investigation into Wilson's allegations. While the investigation was underway, Wilson was notified

that Clark had been prohibited from having any direct contact with her at work. Both Wilson and Clark were instructed to communicate with each other, if necessary, only through third parties.

None of the witnesses interviewed by Richmond corroborated Wilson's version of the events, and Richmond concluded that the allegations could not be substantiated. Nonetheless, IDJJ's actions were timely, reasonably calculated to prevent future harassment, and apparently effective. There have been no further incidents of sexual harassment since Wilson made her August 21 complaint to IDJJ. Therefore, even if Clark's actions constitute sexual harassment, IDJJ cannot be held liable for his behavior.

## II.     Retaliation Claim

Title VII prohibits an employer from retaliating against an employee who has "opposed any practice" made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). Retaliation may be proven through either a direct or indirect method. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). Under the direct method, a plaintiff makes a *prima facie* case by showing: (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action taken by her employer, and (3) a causal connection between the two. *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010). To establish a *prima facie* case under the indirect method, the plaintiff must demonstrate: 1) that she was engaged in protected activity; 2) that she was subjected to an adverse employment action; 3) that she was performing her job satisfactorily; and 4) that she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Hilt-Dyson*, 282 F.3d at 465. Failure to satisfy any element of the *prima facie* case is "fatal" to the employee's retaliation claim. *Id.*

Here, Wilson fails to establish a *prima facie* case of retaliation. To start, a number of the actions Wilson cites as retaliatory do not qualify as "adverse employment actions" for purposes of establishing a retaliation claim. "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (quotations and citations omitted). The action must be "materially adverse" because "it is important to separate significant from trivial harms." *Id.* "'[P]etty slights, minor annoyances, and simple lack of good manners' are normally not sufficient to deter a reasonable person." *Lucero v. Nettle Creek School Corp.*, 566 F.3d. 720, 729 (7th Cir. 2009) (quoting *Burlington*, 548 U.S. at 68). Also, the "standard for judging harm must be objective." *Burlington,* 548 U.S. at 68.

Wilson believes that, as a result of her August 2005 complaint, Clark retaliated on November 11, 2005 by documenting her late arrival on the shift supervisor report. Yet Wilson admits she was late and concedes the write-up caused no disciplinary action or consequence. Wilson believes Clark intentionally failed to respond to a fight that occurred on her watch in a cafeteria between two youths. Although Clark did not take action to stop the dispute, another security staff member on hand, who was authorized to handle such situations, halted the fight. Wilson was not harmed or disciplined as a result of the incident. Wilson also claims that IDJJ retaliated against her because she faced a suspension over her attendance problems, even though the suspension was never issued or served. "An unfulfilled threat, which results in no material harm, is not materially adverse." *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1121 (7th Cir. 2009) (quoting *Ajayai v. Aramark Bus. Servs.* 336 F.3d 520, 531) (7th Cir. 2003)). Those actions were not "materially adverse."

15

Wilson further points to her reassignment for two months in late 2005 to the Maya A/B Cottage, an assignment she believes was more stressful. The test for whether a reassignment of duties is a materially adverse action is an objective one. *Burlington*, 548 U.S. at 71; *Lucero*, 566 F.3d at 729. Wilson has not presented any evidence demonstrating an issue of fact as to whether the assignment to Maya A/B Cottage would deter a reasonable employee from making or supporting a charge of discrimination. *See Lucero*, 566 F. 3d at 729. Wilson also fails to present any evidence that the decision to reassign her was based on a retaliatory motive. On the contrary, Wilson admits that she had been assigned to the Maya A/B Cottage numerous times before her August 2005 complaint, and that another employee who did not complain about discrimination was also given that assignment after August 2005. (Wilson Dep at 239-40.)

Wilson claims she was denied a hardship transfer in January 2006 shortly after she filed with the EEOC. That might arguably be a materially adverse action. But she has presented no evidence that the committee denying the transfer had any knowledge of her filing or her previous complaint, or that the decision was influenced by anyone who knew of her filing or the complaint. *See Poer v. Astrue*, 606 F.3d 433, 440 (7th Cir. 2010); *Hill v. Potter*,____F. 3d. ___, 2010 WL 3385194 at *4 (7th Cir. 2010). The fact that the decision was made shortly after Wilson's EEOC filing is not enough in itself to create a question of fact on the causal element of the *prima facie* case. "On summary judgment, in particular, 'it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact.'" *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004)).

Finally, in October 2006 Wilson was given a three-day suspension for failing to secure youths during a fire drill. Because a served suspension without pay is considered an adverse action, Wilson

satisfies that element of her prima facie case. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005); *Markel v. Board of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002). Nonetheless, Wilson fails to show a causal connection to her complaints. Although Clark was involved in the incident, he was not involved in the hearing or the decision. The timing – ten months after her EEOC filing – is too long to infer a link between the two. *See Leonard v. Eastern Illinois Univ.*, 606 F.3d 428, 432 (7th Cir. 2010) (six month lag too long to infer a link). Furthermore, the decision was rendered after she was given a hearing at which she was represented by the union, and she had the opportunity to appeal. "While Title VII protects victims of sexual harassment from being terminated in retaliation for reporting harassment, an employee's complaint of harassment does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior." *Hall v. Bodine Elec.Co.*, 276 F.3d 345, 359 (7th Cir. 2002).

Wilson has failed to establish a prima facie case by the direct method. She has likewise not demonstrated that she was treated worse than any other similarly situated employees who did not engage in statutorily protected activity. In her deposition, Wilson identified one co-worker, Sharun Coleman, whom she believes was treated more favorably than herself and who did not engage in statutorily protected activity. (Wilson Dep. at 236, 238.) The only example Wilson provided of more favorable treatment was that Coleman was not assigned the "heavy post assignments," like Maya A/B Cottage. (*Id*. at 239.) Later in her deposition, however, Wilson contradicted that statement and admitted that Coleman had been assigned to the Maya A/B Cottage after August 2005. (*Id*. at 240-41.) Thus, Wilson has failed to establish a *prima facie* case of retaliation by either the direct or indirect methods.

**CONCLUSION**

For the reasons set forth above, the Illinois Department of Juvenile Justice's motion for summary judgment is granted. Judgment is entered in favor of the defendant and against the plaintiff Lisa Wilson.

IT IS SO ORDERED.

_____
GERALDINE SOAT BROWN
United States Magistrate Judge

DATED: October 19, 2010